Michael R. Lozeau (State Bar No. 142893)
E-mail: michael@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Shana Lazerow (State Bar No. 195491)
E-mail: slazerow@cbecal.org
COMMUNITIES FOR A BETTER ENVIRONMENT
340 Broadway
Richmond, CA 94801
Tel: (510) 302-0430 x 18
Fax: (510) 302-0438

Attorneys for Plaintiff
COMMUNITIES FOR A BETTER ENVIRONMENT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| COMMUNITIES FOR A BETTER ENVIRONMENT, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> EVERPORT TERMINAL SERVICES INC., a corporation, <br><br> Defendant. | Case No. _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

Plaintiff Communities for a Better Environment ("CBE"), by and through its counsel, alleges as follows:

COMPLAINT                                              1

1.     This is a civil suit brought suit under brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act") against Everport Terminal Services Inc. ("Everport" or "Defendant") arising out of operations at Everport's facility located at 389 Terminal Way, San Pedro, CA 90731 (the "Facility").

2.     This action addresses Everport's unlawful discharge of pollutants from the Facility into the Los Angeles Harbor and the overall San Pedro Bay Watershed.  The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Order No. 97-03-DWQ ("1997 Permit") as renewed by Order No. 2015-0057-DWQ ("2015 Permit").  The 1997 Permit was in effect between 1997 and June 30, 2015, and the 2015 Permit went into effect on July 1, 2015.  As explained below, the 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.  As appropriate, CBE refers to the 1997 and 2015 Permits in this Complaint collectively as the "General Permit."

3.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

4.     Los Angeles area waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species.  Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities.  The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges.  Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into Los Angeles area waters.

5.     Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

6.     CBE seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Everport's violations of the CWA.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to § 505(a)(1) of the CWA, 33 U.S.C. § 1365(a0(1), 28 U.S.C. § 1331, and 28 U.S.C. § 2201. The relief requested is authorized pursuant to 28

U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8.      On January 14, 2020, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), CBE provided notice of intent to file suit against Everport for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the United States Attorney General; the Executive Director of the State Water Resources Control Board; the Regional Administrator of EPA Region IX; the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, (collectively "state and federal agencies"); and Everport.

9.      The Notice Letter provided Everport with sufficient information to determine (i) the CWA requirements CBE alleges Everport violated; (ii) the activity alleged to constitute the violation(s); (iii) sufficient information to determine the date, location, and person responsible for the violation(s); and (iv) the contact information for CBE and CBE's Counsel.  A copy of the Notice Letter is attached as Exhibit 1.

10.      More than sixty (60) days have passed since notice of the alleged violation was served upon Everport and the state and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged herein.  No claim in this action is barred by any prior administrative action pursuant to

§ 309(g) of the CWA, 33 U.S.C. § 1319(g).

11.    Venue is proper in the Central District of California pursuant to § 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

12.    Plaintiff CBE is an environmental justice organization organized under the laws of the State of California with a local office in Wilmington, California.  CBE has approximately 6,000 members who live, recreate and work in and around waters of the State of California, including the Los Angeles Harbor and San Pedro Bay.  Many of its members live and/or recreate in and around Los Angeles County.  CBE is dedicated to empowering low-income communities of color that seek a voice in determining the health of their air, water and land.  To further these goals, CBE actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions.

13.    CBE has members living in the communities near the Facility and the Los Angeles Harbor Watershed.  They enjoy using the Los Angeles Harbor and San Pedro Bay for recreation and other activities.  CBE members use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  CBE members use those areas to recreate and view wildlife, among other activities.  Defendant's discharges of pollutants threaten or impair each of those uses or

contribute to such threats and impairments.  Thus, the interests of CBE's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

14.     CBE brings this action on behalf of its members.  CBE's interest in reducing Defendant's discharges of pollutants into the Los Angeles Harbor, San Pedro Bay, and their tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CBE.

15.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

16.     Defendant Everport Terminal Services is an active California company located at 389 Terminal Way, San Pedro, California, 90731.

## BACKGROUND

17.     The Facility collects and discharges storm water from its 180-acre marine cargo site into at least six storm water discharge locations at the Facility.  The Facility discharges stormwater to a set of storm drains at the Facility, which conveys the Facility's storm water discharges into the Los Angeles Harbor, which flows into San

Pedro Bay.

**Clean Water Act**

18.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.   Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

19.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

20.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2.   The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.   The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit

application. 40 C.F.R. § 122.21.

21.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

22.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains, or makes more stringent, the requirements of the 1997 Permit.

23.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

24.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit prohibit discharges unless pollutants have been reduced or prevented through implementation

of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

25.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

26.    Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

27.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources;

and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. 2015 Permit, §§ X(G)(2), (4), (5). Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

28. The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. 2015 Permit, § X(H)(1). Failure to implement these

minimum BMPs is a violation of the 2015 Permit.  2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table.  2015 Permit, § X(H)(4), (5).

29.    The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP") (previously known as the Monitoring and Reporting Program).  The primary objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit requires dischargers to collect storm water

samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. 1997 Permit, § B(5). The 2015 Permit mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year. 2015 Permit, §§ XI(B)(2), (3).

30. Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 Permit, § B(5)(c)(ii). Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

31. Under the 2015 Permit, a facility must analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix." 2015 Permit, § XI(B)(6)(d).

32. Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. 1997 Permit, § B(7); 2015 Permit, § XI.A.

33.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

34.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

35.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report"). 1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  2015 Permit, § XV.

36.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be

applied by dischargers.

**Basin Plan**

37.    The Los Angeles Harbor and overall San Pedro Bay Watershed are waters of the United States.

38.    The CWA requires that water bodies such as the Los Angeles Harbor and overall San Pedro Bay Watershed meet water quality objectives that protect specific "beneficial uses."  The Regional Board has identified beneficial uses of the Los Angeles Harbor and the San Pedro Bay and established water quality standards for these waters in the "Water Quality Control Plan — Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.[1]

39.    The beneficial uses of these waters include, among others, water contact recreation, non-contact water recreation, commercial and sport fishing, marine habitat, and rare, threatened, or endangered species.

40.    The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving body contact with water, where ingestion of water is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating,

---

[1] See http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." *Id*. at 2-5. Contact recreation use includes "swimming, wading, water-skiing, skin and scuba diving, white water activities, fishing, or use of natural hot springs." *Id*.

41.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." *Id*. at 3-45.

42.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id*. at 3-34.

43.     The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses." *Id*. at 3-44.

44.     The Basin Plan provides that "[t]he pH of bays or estuaries shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges." *Id*. at 3-40.

45.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated

beneficial use." *Id*. at 3-30.

46.     The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id*. at 3-33.

47.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses." *Id*. at 3-32.

48.     The EPA has adopted saltwater numeric water quality standards for copper of 0.0048 mg/L (Criteria Maximum Concentration or "CMC") and zinc of 0.009 mg/L (CMC).   65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule); 40 CFR § 131.39.

49.     The EPA 303(d) List of Water Quality Limited Segments lists the Los Angeles/Long Beach Inner Harbor as impaired for copper, PCBs, toxicity, and zinc, among other pollutants.[2]  San Pedro Bay is impaired for toxicity and PCBs, among other pollutants.

50.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water

---

[2] See https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml.

quality, or affect human health from ingestion of water or fish. The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; and copper – 0.0332 mg/L.

51. The 2015 Permit establishes Numeric Action Levels ("NALs"). The 2015 Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; copper – 0.0332 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; and zinc – 0.26 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.

52. When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."

For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

53.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $55,800 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011, up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

I.     **Alleged Violations of the NPDES Permit**

**A. Discharges in Violation of the Permit**

54.     Everport has violated and continues to violate the terms and conditions of the General Permit.

55.     Based on Everport's sampling and analysis results reported to the Regional Board, Everport has discharged and continues to discharge storm water containing copper, zinc, aluminum, iron, and total suspended solids ("TSS") in violation of the

General Permit.

56.     Everport's sampling results from the 2016-2017 reporting year placed the Facility in Level 1 Status pursuant to the General Permit.   The additional NAL exceedances in 2017-2018 placed the Facility into Level 2 Status for aluminum, copper, iron, and zinc.  The NAL exceedances for TSS in 2017-2018 have placed the Facility into Level 1 Status for TSS.  The additional NAL exceedances in 2018-2019 placed the Facility into Level 2 Status for TSS.

57.     Despite the Facility's Level I Status Reports or Level 2 ERA Action Plan, as of July 1, 2019, the Facility remains in Level 2 Status for aluminum, copper, iron, zinc, and TSS.   CBE alleges that since at least January 14, 2015, Everport has discharged storm water contaminated with pollutants at levels that exceed the applicable NALs and EPA Benchmarks for aluminum, copper, iron, zinc, and TSS.

58.     Everport was required to implement BAT/BCT to reduce or eliminate the discharges of conventional, toxic, and nonconventional pollutants from the Facility. Plans, reports and sampling data prepared or collected by Everport indicate that Everport has not implemented BAT and BCT at the Facility for its discharges of aluminum, copper, iron, zinc, and TSS, and potentially other pollutants, in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

59.     In addition, CBE's investigation indicates that the Facility is discharging

storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(I) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A), VI(B), and V1(C) of the 2015 Permit.  CBE alleges that such violations also have occurred and will occur on other rain dates, including on information and belief every significant rain event that has occurred since January 14, 2015 and that will occur at the Facility subsequent to the date of this Complaint.

60.     These discharges from the Facility are ongoing.  Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Permit and the Act.  Each discharge of storm water constitutes an unauthorized discharge of aluminum, copper, iron, zinc, and/or TSS, and storm water associated with industrial activity in violation of Section 301(a) of the CWA.  Each day that the Facility operates without implementing BAT/BCT is a violation of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Everport is subject to penalties for violations of the General Permit and the Act since January 14, 2015.

**B. Failure to Conduct Sampling and Analysis.**

61.     The 1997 Permit requires facility operators to develop and implement an adequate Monitoring and Reporting Program before industrial activities begin at a facility.  See 1997 Permit, § B(1).  The 2015 Permit includes similar monitoring and

reporting requirements.  See 2015 Permit, § Xl.

62.     The primary objective of the Monitoring and Reporting Program is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  An adequate Monitoring and Reporting Program therefore ensures that BMPs are effectively reducing and/or eliminating pollutants at a facility, and is evaluated and revised whenever appropriate to ensure compliance with the General Permit.

63.     Sections B(3)-(16) of the 1997 Permit set forth the monitoring and reporting requirements.  As part of the Monitoring Program, all facility operators must conduct visual observations of storm water discharges and authorized non-storm water discharges, and collect and analyze samples of storm water discharges.  As part of the Reporting Program, all facility operators must timely submit an Annual Report for each reporting year.  The monitoring and reporting requirements of the 2015 Permit are substantially similar to those in the 1997 Permit, and in several instances more stringent.

64.     The 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  See 1997 Permit, § B(5).  A sample must be collected from each discharge point at the facility, and in the event that an operator fails to collect samples

from the first storm event, the operators must still collect samples from two other storm events and "shall explain in the Annual Report why the first storm event was not sampled." See 1997 Permit, § B(5)(a). The 2015 Permit now mandates that facility operator sample four (rather than two) storm water discharges from all discharge locations over the course of the reporting year. See 2015 Permit, §§ XI(B)(2), (3).

65.     Storm water discharges trigger the sampling requirement under the 1997 Permit when they occur during facility operating hours and are preceded by at least three working days without storm water discharge. See 1997 Permit, § B(5)(b). The 2015 Permit shortens the preceding no discharge period to 48 hours. See 2015 Permit, § X1(B)(1). Samples must be collected from each drainage area at all discharge locations and be representative of storm water associated with the Facility's industrial activity and any commingled discharges. See 2015 Permit, § Xl(B)(4); see also 1997 Permit § B(5)(a). "The Discharger shall collect and analyze storm water samples from two (2) [qualifying storm events] QSEs within the first half of each reporting year (July Ito December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30)." 2015 Permit, Xl(B)(2).

66.     A discharger must submit the sampling and analytical results to the State Board's SMARTs database within 30 days of obtaining all results for each sampling event. 2015 Permit, XI(B)(11)(a).

67.     Because Everport failed to enroll in the General Permit until June 2016,

Everport failed to collect any storm water samples from the facility for the 2014-2015 and 2015-2016 rainy seasons.  By failing to enroll in the General Permit and failing to obtain storm water samples, Everport violated Sections 301(a) and 402 by discharging pollutants from a point source without obtaining an NPDES permit.  The failure to obtain a permit and gather representative storm water samples and testing results for the Facility for the 2014-2015 and 2015-2016 rain years deprives CBE and its members of information and pollution data that the Facility was required to obtain under the Clean Water Act.

68.    On information and belief, CBE alleges that during the 2017-2018 reporting year, Everport failed to collect and analyze storm water samples from two out of the four requisite storm events.  CBE alleges that local precipitation data shows that discharges occurred on several dates during that wet season on which the Facility was open.

69.    Because Everport failed to take two of the four requisite water samples from each of the Facility's four discharge locations for the 2017-2018 reporting year, Everport has violated the General Permit's monitoring requirement for that entire period, amounting to at least 8 violations of the Act.  These violations of the General Permit are ongoing.  Everport is subject to penalties for each of those daily violations of the General Permit and the Act's monitoring and sampling requirements.

**C. Failure to Prepare, Implement Review and Update an Adequate**

**Stormwater Pollution Prevention Plan**

70.     Under the General Permit, the State Board has designated the SWPPP as one of the cornerstones of compliance with NPDES requirements for storm water discharges from industrial facilities, and ensuring that operators meet effluent and receiving water limitations.  Section A(1) and Provision E(2) of the 1997 Permit require dischargers to develop and implement a SWPPP prior to beginning industrial activities that meet all of the requirements of the 1997 Permit.

71.     The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-stormwater discharges.  See 1997 Permit § A(2); 2015 Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations.

72.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit §§ A(9), (10); 2015 Permit § X(B). Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit Factsheet § 1(1).

73.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention

team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective.

74.     Sections X(D)—X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations.  See 2015 Permit § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. See 2015 Permit §§ X(G)(2), (4), (5).

75.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality

assurance and record keeping.  See 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit Fact Sheet §1(2)(o).

76.    The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  Id.

77.    The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  See 2015 Permit § X(H)(4), (5).  A Facility's BMPs must, at all times, be sufficiently robust to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT.  2015 Permit §§ V(A), I(A)(1), I(D)(31), I(D)(32); 1997 Permit, Effluent Limitation B(3), Receiving Water Limitation C(3).

78.    Despite these SWPPP and BMP requirements, Everport has been conducting and continues to conduct industrial operations at the Facility with an inadequately developed, implemented, and/or revised SWPPP.

79.    The SWPPP fails to comply with the requirements of Sections X(A)(2)

and X(E) of the 2015 Permit by failing to include a site map in the SWPPP uploaded to SMARTS.  A facility's site map is one of the required elements of a SWPPP and the complete SWPPP must be uploaded to SMARTS.  See 2015 Permit §§ X(A)(2), X(E), X(B)(2).  The SWPPP fails to comply with the requirements of Sections X(G)(1)(a) and X(G)(2)(a)(ii) of the Permit by failing to include industrial materials resulting from industrial processes and failing to identify pollutants likely to be present in industrial storm water discharges.  Everport's SWPPP identifies vehicle maintenance and repair as an industrial process, including welding, grinding and fabrication, but fails to mention or include any metal pollutants that would result from these processes.

80.     The SWPPP fails to comply with the requirements of Section X(11)(2) of the 2015 Permit.  The SWPPP fails to implement advanced BMPs that are necessary to reduce or prevent discharges of pollutants.

81.     The SWPPP fails to comply with the requirements of Section X(G)(2) of the 2015 Permit.  Under the 2015 Permit, facilities must describe each industrial process in their SWPPP, including, but not limited to, cleaning and maintenance in order to assess potential pollutant sources at each site.  2015 Permit, Section X(G)(1)(a).  Also within this assessment, the discharger must "ensure that the SWPPP includes a narrative assessment of all areas of industrial activity with potential industrial pollutant sources," including "[t]he pollutants likely to be present in industrial storm water discharges." 2015 Permit, Sections X(G)(2)(a), X(G)(2)(a)(ii).  Based on this assessment, facilities

are required to identify any additional parameters that indicate the presence of pollutants in industrial storm water discharges. 2015 Permit, Section X(G)(2)(d). The discharger must then analyze its storm water samples for those identified additional parameters. Section Xl(B)(6)(c).

82.     Based on information and belief, Everport failed to include copper in its analysis of pollutants likely to be present in industrial storm water discharges in its April 29, 2019 SWPPP despite NAL exceedances for copper during the 2018-2019 reporting year. Copper is found in truck and vehicle brake pads, and CBE is informed and believes that the maintenance and cleaning of trucks and vehicles releases copper at the facility. Everport analyzed its industrial processes in its latest SWPPP, including vehicle maintenance and repair and vehicle and equipment washing, but failed to include copper as a potential pollutant source from these industrial processes.

83.     In failing to identify copper as a potential pollutant source, Everport failed to identify copper as an additional parameter in violation of Section X(G)(2)(d). In addition, Everport violated Section Xl(B)(6)(c) by failing to analyze its storm water samples for copper from each of its sampling locations during the 2019-2020 reporting year.

84.     In addition, CBE is informed and believes, and thereupon alleges, that Everport has failed to identify all areas of the Facility discharging storm water associated with industrial activities. Omitted areas include, but are not limited to, areas

where maintenance on cranes occurs.

85.    Everport's implementation of BMPs has failed to prevent storm water discharges that exceed NALs and EPA benchmarks, which have continued to occur. However, Everport has failed to sufficiently update the Facility's SWPPP and has not achieved the General Permit's objective to identify and implement BMPs to reduce or prevent pollutants associated with the industrial activities in storm water discharges consistent with reductions achieved by implementing BAT and BCT at the Facility.

86.    These violations are ongoing, and CBE will include additional violations as information and data become available.  Everport is subject to civil penalties for all violations of the CWA occurring since January 14, 2015.

### D. Failure to Comply with General Permit Evaluation and ERA Requirements.

87.    If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  2015 Permit, ¶ XII(D).  For Level 2 Status, a discharger is required to submit, by January 1 following commencement of Level 2 status, a Level 2 ERA Action Plan requiring a demonstration of either additional BMPs to prevent NAL exceedances, a determination that the NAL exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  2015 Permit § XII(D)(1)(a).  All elements of the Level 2 ERA Action Plan shall be implemented as soon as practicable

and completed no later than 1 year after submitting the Level 2 ERA Action Plan. *Id*. § XII(D)(1)(d).

88.     On or about December 6, 2017 and December 21, 2018, Everport submitted "Exceedance Response Action Evaluation and Report Level Ones" to the State Board's SMARTs system.  The ERA Reports and Level 1 status are triggered by exceedances of the NALs adopted in the 2015 General Permits.  The ERA Level 1 reports must, among other requirements, identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of this General Permit." 2015 Permit, § X II(C)(1)(c).

89.     Everport's 2017 ERA Level 1 report addresses the Facility's exceedance of the NAL for aluminum, copper, iron, and zinc during the 2016-2017 reporting year. Everport's 2018 ERA Level 1 report addresses the Facility's exceedance of the NAL for TSS during the 2017-2018 reporting year.  Although the reports identify these NAL exceedances, Everport failed to identify BMPs necessary to prevent future NAL exceedances or to comply with BAT/BCT requirements of the permit.

90.     The 2017 ERA Level 1 Report identifies two additional BMPs for all of the aluminum, copper, iron, and zinc NAL exceedances.  By January 2, 2018, the Facility states that it will "Improve House Keeping BMPs to conduct sweeping/cleaning on a daily basis," and "Improve Material Handling and Waste Management BMPs by

constructing lids or having tarps readily accessible to cover cable spools, scrap metal bins, and roll offs utilized throughout the facility." However, these measures have not achieved the applicable NALs for these pollutants.

91. Additionally, the 2018 ERA Level 1 Report identified four additional BMPs for the TSS NAL exceedances. In 2019, the Facility states that it will implement "concrete curbs and berms to contain pollutants and prevent tracking of debris and materials into the work areas," "Supplement Material Handling & Waste Management BMPs by having tarps and lids readily accessible for scrap bins and roll offs to minimize exposure of pollutants to storm water" and "Supplement Good Housekeeping BMPs with the mechanical BMP of industrial shop vacs for the M&R." However, these additional BMPs did not achieve the NALs. Although each of the identified BMPs is a useful element to the Facility's SWPPP, CBE alleges that the BMPs, taken either individually or collectively, do not amount to BCT addressing TSS at the Facility.

92. Although "[i]t is not a violation of this General Permit to exceed the NAL values; it is a violation of the permit, however, to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of NAL exceedances." General Permit Fact Sheet, p. 60. See 2015 Permit. Finding 53 ("A Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of this General Permit").

93. Accordingly, Everport has violated and continues to violate the General

Permit and the CWA every day that the Facility operates without adequate Level 1 and Level 2 ERA Reports for aluminum, copper, iron, zinc, and TSS. These violations are ongoing. Everport is subject to civil penalties for each day it has failed to submit an adequate Level 1 or Level 2 ERA Report.

### E. Failure to Comply with Monitoring and Sampling Requirements

94. The 2015 Permit requires facilities to prepare a Monitoring Implementation Plan for inclusion in the SWPPP, which must include, among other requirements, a description of discharge locations at the facility, 2015 Permit, Section X(1)(2). The 2015 Permit also requires that "samples shall be collected from each drainage area at all discharge locations." 2015 Permit, Section Xl(B)(4).

95. Prior to the 2019-2020 reporting year, Everport identified industrial activities in and around the Crane Shop and took samples from the drainage area of the Crane Shop at the facility. In April of 2019, Everport submitted an updated SWPPP with a No Exposure Certification ("NEC") evaluation for the drainage area of the Crane Shop and, based on the NEC, removed the Crane Shop drainage area from monitoring and sampling requirements. However, the NEC evaluation fails to justify and adequately explain how the drainage area of the Crane Shop is not exposed to industrial activities occurring at the Crane Shop.

96. Upon information and belief, Everport conducts industrial activities at the Crane Shop, including crane cleaning activities, and is a designated location for waste

storage and handling of both hazardous and non-hazardous waste at the Facility.

97.     Accordingly, Everport has violated and continues to violate the General Permit and the CWA every day that the Facility operates without monitoring and sampling storm water discharges from the Crane Shop drainage area. These violations are ongoing. Everport is subject to civil penalties for each day that it has failed to monitor and sample storm water discharges from the Crane Shop drainage area.

## FIRST CAUSE OF ACTION
### Violations of the General Permit and the CWA
### (Violations of 33 U.S.C. §§ 1311, 1342)

98.     CBE incorporates the allegations contained in all other paragraphs as though fully set forth herein.

99.     As detailed above, Everport has violated the CWA and the General Permit in the following ways:

    a. Discharging stormwater associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT;

    b. Failure to conduct sampling and analysis;

    c. Failure to prepare, implement, review, and update an adequate SWPPP;

    d. Failure to comply with General Permit evaluation and ERA requirements; and

    e. Failure to comply with monitoring and sampling requirements.

100.    By committing the acts and omissions alleged above, Everport is subject

to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

101.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm CBE, for which harm he has no plain, speedy, or adequate remedy at law.

102.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **RELIEF REQUESTED**

CBE respectfully request this Court to grant the following relief:

A.      Declare Defendant to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Stormwater Permit;

B.     Enjoin Defendant from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

C.     Order Defendant to pay civil penalties per day for all violations in accordance with CWA section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1-19.4;

D.     Award CBE its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d); and

E.     Award any such other relief as this Court may deem appropriate.

Dated: July 24, 2020                    Respectfully submitted,


                                        By:    _/s/ Michael R. Lozeau_____
                                               Michael R. Lozeau
                                               LOZEAU DRURY LLP
                                               Attorneys for Communities for a Better
                                               Environment